IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 1:17-MJ-347 |
| ) | |
| DONALD BUTLER ) | The Honorable John F. Anderson |
| ) | |
| a.k.a. "DONALD BUTLER, JR.," ) | |
| a.k.a. "DON JUAN," ) | |
| a.k.a. "D," ) | |
| ) | |
| Defendant. | |

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Roger Ray Dean, being duly sworn, depose and state as follows:

### INTRODUCTION

1. I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since July of 2015. I am currently assigned to a squad that investigates violent gang and drug criminal enterprises out of the Northern Virginia Resident Agency of the Washington, D.C. Field Office of the FBI.

2. While with the FBI, I have investigated drug trafficking and gang-related activity, which resulted in the arrest of subjects, the seizure of property and assets, and the seizure of controlled substances. As a result of my training and experience, I am familiar with the manner in which controlled substances are used and distributed. I have also become familiar with the methodology used in narcotics trafficking operations, as well as the unique trafficking patterns and language employed by drug dealers.

3. During my employment with the FBI, I also gained knowledge in the use of various investigative techniques, including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, the service of administrative subpoenas, and the execution of search and arrest warrants.

4. This affidavit is submitted in support of an application for a criminal complaint for DONALD BUTLER JR a.k.a. "DON JUAN," a.k.a. "DON," a.k.a. "D" (hereinafter "BUTLER"), for conspiracy to distribute one-hundred (100) grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

5. This affidavit contains information necessary to support probable cause. The information contained in this affidavit is not intended to include each and every fact and matter observed by or known to the United States. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from state and federal law enforcement officers, and information provided by cooperating defendants. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

6. This investigation is based in part on information learned from confidential sources (CS), unindicted co-conspirators (UCC), and cooperating defendants (CD). For the purposes of this affidavit, each CS, UCC, and CD will be referred to in the masculine, regardless of actual gender. The basis of knowledge and reliability of each will be described in more detail *infra*.

## **PROBABLE CAUSE**

I. **BUTLER's Role in the Heroin Conspiracy as Detailed by Fairfax County Police Reporting, Confidential Sources, Cooperating Defendant, and Unindicted Co-conspirators**

   **A.   Background**

   7.   This investigation was initiated based on information obtained from multiple individuals encountered during an investigation conducted by the Fairfax County Police Department's Narcotics Unit spanning from August 2016 to present. In March 2017, a confidential source (CS-1)[1] reported an individual by the alias, "DOM" was distributing heroin to residents of Northern Virginia area. CS-1 informed law enforcement that he started purchasing heroin directly from this individual in August 2016—typically one to two grams of heroin daily, and never more than seven grams at a time—and that the same individual provided CS-1 with phone number (571) 494-3192 to facilitate heroin transactions. CS-1 reported first meeting this individual approximately five years ago. A law enforcement database query identified the likely user of (571) 494-3192 as BUTLER. CS-1 identified an individual in a known photograph of BUTLER, provided by law enforcement as "DOM," and confirmed that "DOM" was the same

---

[1] CS-1 became a cooperating source in March 2017 to gain relief from potential drug related charges. CS-1 has provided information that law enforcement has corroborated through controlled drug purchases, physical surveillance, and telephone records analysis. CS-1 was not a paid informant, but law enforcement did purchase $10 of gasoline for CS-1's vehicle to facilitate a controlled purchase as part of this investigation. CS-1 had one prior misdemeanor domestic violence charge that was dismissed before adjudication. CS-1 participated in several controlled purchases of narcotics and provided confirmable and reliable information to law enforcement. In late-March 2017, law enforcement discontinued utilization of CS-1 because he entered an in-patient drug rehabilitation program. On or about June 29, 2017, CS-1 died from a suspected heroin overdose. The information provided by CS-1 did not lead to an arrest before his death. With respect to this case, CS-1 participated in controlled drug purchases, and assisted in verifying telephone records, as well as information obtained from various public databases and subpoenaed telephone records. CS-1's information was never been shown to be false or misleading. For these reasons, I consider CS-1's information to be reliable

3

person who had provided him with the phone number (571) 494-3192, and from whom he had been purchasing heroin since August 2016.

**B.     Historical Drug Transactions with CS-1 and BUTLER**

8.     On or about March 9, 2017, the FBI and FCPD utilized CS-1 to conduct a controlled purchase of approximately two grams of heroin from BUTLER. Before the transaction, law enforcement searched CS-1 for money and contraband, with negative results. Law enforcement provided CS-1 with $200 of official funds, a transmitter, and two recording devices.

9.     CS-1 arranged the transaction by contacting BUTLER at cellular telephone number (571) 494-3192. During this controlled purchase, CS-1 and BUTLER met at a location in Washington, D.C. Law enforcement observed a white Toyota Sequoia, bearing Washington, D.C. license plate FJ3022, driven by BUTLER. Law enforcement then saw BUTLER approach the passenger side of CS-1's vehicle at which point CS-1 lowered the passenger side window. BUTLER placed four small baggies containing off-white powder wrapped in a white tissue on the passenger seat and CS-1 handed BUTLER a cigarette pack containing $200. After the transaction was complete, law enforcement met with CS-1 and retrieved the suspected heroin. Law enforcement was present throughout this controlled purchase conducting surveillance. Due to the possible presence of fentanyl, the substance was not field-tested. However, a subsequent DEA Mid-Atlantic Laboratory analysis was conducted on the substance, which confirmed the presence of Heroin (Schedule I).

10.    A law enforcement database query showed that the Toyota Sequoia that law enforcement observed during the March 9, 2017, controlled purchase is registered to Sarah Ivy Butler. Further database queries showed that Sarah Ivy Butler is BUTLER's mother.

11. On March 17, 2017, the FBI and FCPD utilized CS-1 to conduct a controlled purchase of approximately two grams of heroin from BUTLER. Before the transaction, law enforcement searched CS-1 for money and contraband, with negative results. Law enforcement provided CS-1 with $200 of official funds, a transmitter, and two recording devices.

12. CS-1 arranged the controlled purchase by contacting BUTLER at cellular telephone number (571) 494-3192. CS-1 and BUTLER agreed to meet at a location in Washington, D.C. to conduct the transaction. Law enforcement was present throughout the controlled purchase, conducting surveillance. After CS-1 arrived at the agreed on meeting location, law enforcement observed a white Toyota Sequoia, bearing Washington, D.C. license plate FJ3022, pull up next to CS-1's vehicle. After it pulled up, an unknown African-American male exited the passenger side of the Toyota Sequoia, approached the passenger side of CS-1's vehicle, and opened the passenger side door. The African-American male placed four small baggies containing off-white powder wrapped in a white tissue on the passenger seat and CS-1 handed that individual $200. After the transaction was complete, law enforcement followed CS-1 to a pre-arranged location where law enforcement retrieved the suspected heroin. Due to the possible presence of fentanyl and the medical risks associated with it, the substance was not field-tested. However, a subsequent DEA Mid-Atlantic Laboratory analysis was conducted on the substance, which confirmed the presence of Heroin (Schedule I). CS-1 confirmed the individual driving the Toyota Sequoia was BUTLER.

13. On March 23, 2017, the FBI and FCPD utilized CS-1 to conduct a controlled purchase of approximately two grams of heroin from BUTLER for $200. CS-1 arranged the controlled purchase by contacting BUTLER at cellular telephone number (571) 494-3192. Before the transaction, law enforcement searched CS-1 for money and contraband, with negative

results. Law enforcement provided CS-1 with $200 of official funds, a transmitter, and two recording devices. Law enforcement was present throughout the controlled purchase, conducting surveillance. CS-1 and BUTLER agreed to meet at a location in Washington, D.C.

14. CS-1 arrived at what he believed was the agreed on meeting location, but BUTLER required CS-1 to go to several other locations before revealing his (BUTLER's) actual location. Based on my training and experience and knowledge of this investigation, I believe BUTLER was attempting to avoid detection by law enforcement.

15. On arrival, CS-1 pulled up alongside BUTLER's vehicle, a white Toyota Sequoia, bearing Washington, D.C. license plate FJ3022, and tossed a cigarette pack containing the $200 through the open driver's side window. A white paper towel containing four small baggies that contained an off-white/light brown powder substance was tossed from BUTLER's vehicle into CS-1's vehicle. After the transaction was complete, law enforcement followed CS-1 to a meeting location and retrieved the suspected heroin. Law enforcement observed BUTLER's vehicle depart the location where the transaction took place. Due to the possible presence of fentanyl and its associated medical risks, the substance was not field-tested. However, a subsequent DEA Mid-Atlantic Laboratory analysis was conducted on the substance, which confirmed the presence of Heroin (Schedule I).

C. **Historical Drug Transactions with CS-2 and BUTLER**

16. On October 3, 2016, the FBI and FCPD utilized CS-2[2] to conduct a controlled

---

[2] CS-2 became a cooperating source in November 2015. CS-2 participated in controlled purchases of narcotics and provided information that law enforcement was been able to corroborate through independent means. CS-2 was a paid law enforcement informant and received approximately $1,000 in the approximately two years he has acted as a confidential source. On or about October 12, 2016, law enforcement stopped using CS-2 as an informant because of his use of controlled substances. CS-2 entered a drug rehabilitation program;

purchase of approximately three grams of heroin from BUTLER. Before the transaction, law enforcement searched CS-2 for money and contraband, with negative results. Law enforcement provided CS-2 with $200 of official funds, a transmitter, and two recording devices. CS-2 contacted BUTLER at (571) 494-3192. Law enforcement was present throughout the controlled purchase conducting surveillance. Before the controlled purchase, CS-2 and BUTLER agreed to meet at a location in Washington, D.C. Law enforcement subsequently confirmed that CS-2 had in fact contact (571) 494-3192 by examining toll records. The call was not recorded but portions of the call were captured on the audio device that law enforcement provided CS-2 prior to the transaction.

17.   CS-2 was transported to the controlled purchase by a FCPD undercover detective. As CS-2 and the detective neared the pre-determined location, CS-2 communicated with BUTLER over telephone number (571) 494-3192. BUTLER instructed CS-2 to stand on the corner of "Mississippi and 2nd." Based on my training and experience, and knowledge of this investigation, I believe BUTLER instructed CS-2 to exit the vehicle with the detective, stand on the corner of Mississippi Avenue and 2nd Street, S.E., Washington, D.C., and wait for BUTLER to arrive. Shortly thereafter, law enforcement observed a blue BMW, bearing Washington, D.C. license plate EW3180, arrive at the corner of Mississippi Avenue and 2nd Street, S.E.,

---

however, information obtained throughout the investigation leads investigators to believe that CS-2 purchased an unknown amount of heroin from BUTLER outside the confines of his cooperation with law enforcement. In March 2017, law enforcement terminated CS-2 terminated as a confidential source. CS-2's criminal history includes misdemeanor convictions for drug-related charges (possession) and larceny. The information provided by CS-2 has led to arrests and has furthered other active investigations. With respect to this case, CS-2's information concerning BUTLER has been corroborated through controlled drug purchases, telephone record analysis, information obtained from various public databases, and subpoenaed telephone records. For these reasons, I consider CS-2 to be reliable.

Washington, D.C. Law enforcement then observed CS-2 enter that same BMW.

18. After approximately one minute, CS-2 exited the blue BMW and re-entered the detective's vehicle. Once inside the vehicle, CS-2 gave the detective six clear plastic bags, each containing an off-white powder substance. CS-2 confirmed that he obtained the suspected heroin from BUTLER inside the BMW. A law enforcement database query confirmed that the blue BMW bearing Washington, D.C. license plate EW3180, is also registered to Sarah Ivy Butler—BUTLER's mother. The substance field-tested positive for the presence of heroin. A subsequent DEA Laboratory chemical analysis confirmed the substance contained heroin and weighed approximately 2.489 grams.

### D. INFORMATION FROM CD-1

19. In May 2017, CD-1[3] pleaded guilty to conspiring to distribute heroin and fentanyl. Pursuant to his plea, CD-1 admitted: that on October 14, 2016, he purchased what he believed was heroin from a source of supply in Washington, D.C.; that he provided this same heroin to an individual at a grocery store in Annandale, Virginia, in exchange for approximately $60; that the individual to whom he sold heroin ingested it intravenously, quickly experienced an overdose and became unresponsive, and was pronounced dead at Fairfax Hospital; that a subsequent toxicology examination of fluids taken from the decedent's body at or near the time of death

---

[3] CD-1 is cooperating with law enforcement to gain relief from a sentence for a felony narcotics conviction. In May 2017, CD-1 pleaded guilty to conspiracy to distribute heroin and fentanyl before the United States District Court for the Eastern District of Virginia. CD-1 has an additional felony conviction for a controlled substance offense. CD-1 has known BUTLER for several years. BUTLER became CD-1's main heroin source of supply in or around February 2016 until his arrest in October 2016. Law enforcement has been able to independently corroborate CD-1's information through, among other methods, a consent-based examination of CD-1's cellular telephone, on which his contacts with BUTLER were preserved. For these reasons, I consider CD-1 to be reliable.

showed both a lethal concentration of fentanyl,[4] a Schedule II controlled substance, and the metabolites of heroin, a Schedule I controlled substance; and that a forensic pathologist found that the victim died from a mixed drug intoxication by heroin and fentanyl.

20. Pursuant to his plea agreement, CD-1 agreed to speak with law enforcement about his involvement in criminal activity, including drug trafficking. CD-1 admitted to re-distributing heroin that he purchased from BUTLER. CD-1 admitted that BUTLER was the co-conspirator from whom, on October 14, 2016, he obtained the substance that he distributed to the decedent referenced in paragraph 20. CD-1 identified BUTLER from a photograph and, again, confirmed that BUTLER sold him the substance (heroin mixed with fentanyl) that he distributed to the decedent on October 14, 2016. CD-1 also provided the access code to his cellular telephone and consented to a law enforcement search of its contents. That search confirmed that CD-1 contacted (571) 494-3192 on October 14, 2016, before he made the fatal distribution in Annandale, Virginia. Law enforcement noted that (571) 494-3192 was saved in CD-1's contacts as "DON NEW." CD-1 confirmed that he knew BUTLER as "D," "DON," and "DON JUAN."

21. CD-1 informed law enforcement that BUTLER became his main source of supply in February 2016. CD-1 admitted that he typically traveled from Fairfax County, Virginia, to Washington, D.C., and occasionally Maryland, to purchase heroin from BUTLER. CD-1 also

---

[4] Fentanyl is a Schedule II controlled substance and highly potent synthetic opioid. In my training and experience investigating this and other cases involving opiates, I have learned that distributors often adulterate heroin with fentanyl to increase the strength of their product. This is often done as a marketing technique. Through my training and experience, I have learned that opioid addicts often seek out substances that they know have caused overdoses and deaths because they believe it will give them a better "high." I have learned that many addicts are so motivated to achieve a better "high" that they are willing to incur the risks associated with dangerous drugs, such as fentanyl. Unsupervised use of fentanyl is substantially more likely to cause serious bodily injury or death than the type of heroin typically purchased by end-users, even for those with high tolerances built up over long periods of opioid abuse.

admitted that the majority of his (CD-1's) customers were in Northern Virginia. CD-1 typically purchased one-quarter of an ounce, or approximately 7 grams, of heroin from BUTLER for approximately $500. CD-1 reported that the most heroin he ever purchased from BUTLER in a single transaction was 14 grams. CD-1 admitted that he purchased approximately 7 grams of heroin from BUTLER on an, almost, daily basis. CD-1 estimated that he purchased heroin from BUTLER on approximately 250-275 occasions. CD-1 recalled that on approximately five occasions, BUTLER provided him heroin on a consignment basis known as "fronting," wherein BUTLER supplied CD-1 with heroin with the understanding that CD-1 would pay him after the heroin was sold. CD-1 also believes BUTLER adulterates, or "cuts," the heroin he sells with other substances. Based on my training and experience, I know that "cutting" is a technique employed by narcotics-distributors to increase their overall profits by increasing their inventory. CD-1 recalled an occasion where he was purchasing heroin from BUTLER inside BUTLER's vehicle. During this transaction, CD-1 recalled seeing a plastic bag containing white powder. CD-1 asked BUTLER about the bag. BUTLER informed CD-1 that bag contained caffeine. Based on my training and experience investigating this and other cases involving the distribution of narcotics, I know caffeine is a common "cut" that narcotics distributors use to adulterate their product and increase their inventory. As such, I believe BUTLER likely adulterates the heroin he sells with other substances, including, caffeine.

22. CD-1 normally arranged heroin transactions with BUTLER by contacting him at (571) 494-3192. CD-1 recalled that BUTLER was available to his customers and sub-distributors on a daily basis between approximately 10:00 a.m. and midnight. CD-1 recalled that on a handful of occasions BUTLER did not respond when CD-1 contacted him to acquire heroin. However, CD-1 recalled that BUTLER would eventually reach out to him by text message to re-

establish contact to arrange heroin transactions. CD-1 admitted that he redistributed the heroin he purchased from BUTLER to customers in Fairfax County, and elsewhere, for approximately $100 per gram. The last time CD-1 purchased heroin from BUTLER was on October 26, 2016, the same day he was arrested in the Eastern District of Virginia for the offense to which he pleaded guilty in May 2017. CD-1 was, in fact, in possession of several grams of heroin at the time of his arrest. CD-1 explained that BUTLER knew he had a numerous customers and sub-distributors in Northern Virginia. Nevertheless, CD-1 reported that BUTLER does not travel to Northern Virginia to distribute heroin because he does not want to risk prosecution by state or federal authorities in Virginia.

### E. INFORMATION FROM UCC-1

23. In June 2017, the Prince William County Police Department arrested UCC-1 was arrested by Prince William County Police on a warrant for distribution of heroin. Upon his arrest, UCC-1 agreed to be interviewed by law enforcement. UCC-1 knew his supplier of heroin as "DON JUAN" and or "D". UCC-1 was provided with a known photograph of BUTLER and immediately identified the individual depicted as DON JUAN. UCC-1 stated that he and BUTLER had been dealing with each other since they were both in their 20's. The most heroin UCC-1 has bought from BUTLER at one time was approximately five (5) to six (6) grams. BUTLER charged $100 per gram. The heroin purchased comes in $50 bags which are approximately half (.5) a gram per bag. UCC-1 explained that two (2) bags are equivalent to 1 gram of heroin. UCC-1 knew BUTLER to use a (571) area code telephone number, but could not recite it from memory.

24. UCC-1 last bought heroin from BUTLER on June 13, 2017. On June 13, 2017, UCC-1 purchased approximately $100 worth of heroin, or approximately 1 gram. UCC-1

recalled on this occasion paying BUTLER with $50 in cash and $50 worth of baby formula. UCC-1 recalled that the heroin came in two separate bags, each containing approximately .5 (half) a gram each.

25. UCC-1 got out of jail in or around January 2017 and had seen BUTLER approximately three time per week for the past five months. UCC-1 knew BUTLER to drive a white Toyota Sequoia, and previously a blue BMW convertible with white interior. UCC-1 described the heroin deals with BUTLER as, "grab and go." UCC-1 recalled that sometimes he has got into the car with BUTLER to conduct heroin transactions. On a few occasions, UCC-1 has met with BUTLER at places he believed to be BUTLER's home.

26. UCC-1 explained that he usually calls or sends BUTLER text messages when crossing "the bridge." Based on my knowledge of this investigation, I believe UCC-1 was referring to the Woodrow Wilson Bridge. According to UCC-1, BUTLER would then tell him where to go to complete the transaction. UCC-1 recalled that sometimes BUTLER was wearing a glove when he handed the heroin to him. UCC-1 also recalled that the heroin BUTLER sells is usually packaged inside a clear bag and wrapped in a paper towel or tissue.

F. **INFORMATION FROM UCC-2**

27. On or about June 7, 2017, law enforcement executed a traffic stop on a vehicle bearing Virginia license plate VAJ7951 in or near Fairfax County, Virginia. During the stop, law enforcement observed drug paraphernalia within the vehicle. The driver was advised that he would be placed under arrest and was advised of his rights against self-incrimination and his right to have an attorney present for any questioning. The driver, hereafter UCC-2, agreed to speak to law enforcement without an attorney present. UCC-2 admitted that he traveled from Warrenton, Virginia, to Southeast Washington, D.C., to purchase approximately $460 worth of

heroin from a man he knew as "DON" or "DON JUAN." UCC-2 admitted that he contacted "DON JUAN" at telephone number (571) 494-3192, known to investigators as a cellular telephone utilized by BUTLER. UCC-2 admitted that he purchased approximately five to six grams of heroin with the intent to provide approximately three grams to a friend. UCC-2 drove from Virginia and met with BUTLER in an alley near Erie Street, SE, Washington, D.C. UCC-2 admitted conducting similar transactions with BUTLER approximately three times a week over the past year. UCC-2 admitted that he typically purchased one to two grams of heroin from BUTLER on each trip. UCC-2 recalled that on one occasion, BUTLER advised him to be careful when using the heroin BUTLER sold him. UCC-2 is currently being held at the Fairfax County Detention Center on state charges for possession of heroin with the intent to distribute.

## G.    EXECUTION OF SEARCH WARRANT ON JULY 21, 2017

28.    On or about July 19, and July 20, 2017, law enforcement intercepted wire and electronic communications over BUTLER's mobile telephone that indicated he planned to travel to New York on July 20, 2017. Additional intercepted communications revealed that the likely purpose of the trip was to obtain a heroin re-supply. On or about July 20, 2017, law enforcement obtained warrant from the Honorable Thomas DiGirolamo, United States Magistrate Judge for the District of Maryland, to search BUTLER's residence, located at 8104 Sport View Road, Hyattsville, Maryland. The warrant allowed for execution at anytime during the day or night. On or about July 20, 2017, Maryland State Troopers conducted a traffic stop on the vehicle in which BUTLER was travelling. A K-9 unit responded and alerted to the presence of narcotics in the vehicle. Maryland State Troopers searched the vehicle but only discovered a small amount of marijuana, and various items of jewelry. During the search BUTLER admitted that he was traveling back to Maryland from New York City after visiting a jewelry store there. In the early

morning hours of on or about July 21, 2017, law enforcement observed BUTLER return to the residence. Shortly after his return, law enforcement saw the light in the garage go on and stay as such for several minutes. Shortly thereafter, law enforcement observed an upstairs light turn on, at which point, law enforcement executed the warrant. During the search of the residence, law enforcement found and seized approximately $21,000.00, and a .40 caliber handgun. Additionally, law enforcement found the following ammunition: 5.56mm, 7.62mm, and 9mm. No other weapons that employed this type of ammunition were discovered. When law enforcement executed the search warrant, officers and agents encountered a woman in the residence named Georgia Denise Robinson. Ms. Robinson insisted that the .40 caliber pistol was hers. When law enforcement entered the garage, agents discovered a 2000 black Honda sedan, a vehicle that law enforcement had not previously associated with BUTLER. Ms. Robinson admitted that the vehicle was hers, and consented, in writing, to a search. Before granting consent, Ms. Robinson emphatically denied having knowledge of any contraband in her vehicle. She additionally admitted that she knew BUTLER was a drug dealer, though she was unaware of what kind of drugs he sold. Ms. Robinson denied any additional knowledge or participation in BUTLER's criminal activities. The search of Ms. Robinson's vehicle led to the discovery of a plastic bag, displaying diamond shapes, which contained approximately 366 grams of suspected heroin. Simultaneous to the search and discovery of the previously listed items, BUTLER agreed to be interviewed by law enforcement without the presence of counsel. During the interview, BUTLER admitted that the purpose of his trip to New York was to obtain an amount of heroin from a jewelry store there.

29. Based on my training and experience and knowledge of this investigation, I believe BUTLER traveled to New York to obtain the heroin that was subsequently found in Ms.

Robinson's car, which was parked in the garage at their shared residence. I further believe that when BUTLER returned to the residence on July 21, 2017, following his traffic stop, he put the plastic bag, displaying diamonds, which contained the suspected heroin, in Ms. Robinson's vehicle.

## CONCLUSION

30. Based on the foregoing, I sumbit there is probable cause to believe that between in and around August 2016 to in and around July 2017, in Fairfax County, Virginia, within the Eastern District of Virginia, and elsewhere, that DONALD BUTLER, a.k.a. "DONALD BUTLER, JR.," a.k.a. "DON JUAN" a.k.a. "D," did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons, both known and unknown, to unlawfully, knowingly, and intentionally distribute one-hundred (100) grams or more of a substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of Title 21, United Stated Code, Sections 841(a)(1) and 846.

Roger R. Dean
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me the 21st day of July, 2017.

_____/s/_____
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge

15